UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

JERRY LEE MORRISSETTE,

                              Petitioner,

   v.

JOHN HENLEY,[1] *et al.*,

                          Respondents.

Case No. 3:21-cv-00189-ART-CLB

**ORDER**

## I.   SUMMARY

Petitioner, Jerry Lee Morrissette, filed a counseled Second Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 ("Petition" (ECF No. 24)). A jury convicted Morrissette of Causing the Death of Another by Driving or Being in Actual Physical Control of a Vehicle while under the Influence of a Controlled Substance and/or Prohibited Substance in violation of NRS § 484C.430 and he is sentenced to 8 to 20 years imprisonment. ECF No. 9-3 at 2. This matter is before the Court for adjudication of the merits of the Petition which alleges Morrissette was denied his constitutional right to effective assistance of trial counsel and to due process based on cumulative error. For the reasons discussed below, the Court grants Ground 1(A) of the Petition.

## II.   BACKGROUND[2]

---

[1] According to the state corrections department's inmate locator page, Morrissette is incarcerated at Northern Nevada Correctional Center (NNCC). *See* NDOC Inmate Search. John Henley is the current warden of that facility. *See* Northern Nevada Correctional Center Facility | Nevada Department of Corrections. At the end of this order, the Court directs the Clerk to substitute John Henley as respondent for Respondent Perry Russell. *See* Fed. R. Civ. P. 25(d).

[2] The Court summarizes the relevant state court record for consideration of the issues. The Court makes no credibility findings or factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes the same solely as background to the issues presented in this case. No assertion of fact made in describing statements, testimony, or other evidence

**A. Facts Underlying the Offense**

**1. Morrissette's vehicle collided with and ran over Gloria Kempe.**

At 5:15 p.m., on October 13, 2011, Reno police arrived at the parking lot of the Town House Motor Lodge to find Gloria Kempe under the rear axle of Morrissette's vehicle. ECF No. 32-35 at 8–10, 12. She was deceased from traumatic asphyxia, thermal burn, and numerous abrasions, contusions, lacerations, and broken bones, after Morrissette's vehicle collided and drove over her. ECF Nos. 32-35 at 16, 19, 63–64; 32-36 at 9–14, 33–35.

Morrissette told police he did not see Kempe. ECF No. 32-35 at 13, 18–19. Morrisette's passenger and girlfriend, Laura Nevil, likewise told police she did not see anything. *Id.* Both Morrissette and Kempe told police they heard and felt "[a] thump, thump" and then heard people yelling for them to stop the car. ECF Nos. 32-35 at 18–19; 32-36 at 59. Eyewitness Deborah Adams told police she estimated Morrissette's vehicle was traveling about "15 to 20 miles per hour." ECF No. 32-35 at 72–81. Reno Police Officer Kent Laskin testified at trial that Morrissette told him he thought he drove over a speed bump. *Id.* at 19.

Nevil testified she was in the passenger seat and did not see Kempe because she was looking out the passenger window at the second-floor units where her friend lived. *Id.* at 28. Nevil did not know in which direction Morrissette was looking because Nevil was looking out the passenger window. *Id.* Nevil told police Morrisette was "looking ahead" because it is in her interview statement; however, on cross-examination, Nevil confirmed that, according to that same statement, she also told police she was looking out the passenger window. *Id.* at 29–35.

Reno Police Officer Kevin McMillin had accident reconstruction training and viewed the Lodge's surveillance photographs in the Lodge office on the night

---

in the state court, constitutes a finding by the Court. Failure to mention a category or piece of evidence does not signify it was overlooked in considering the claims.

of the incident. *Id.* at 38–39, 63. He described what he saw on the video: "The striking vehicle came off of Arlington, came into the parking lot. There was a sun shadow across where you could see a clear line of sun out towards Arlington. And then there was shade back towards the motel." *Id.* He continued, "[t]he vehicle comes in, strikes the pedestrian. The pedestrian goes down under the vehicle. The vehicle stops momentarily and then pulls forward and stops completely." *Id.* at 64. He explained "[w]he the vehicle stopped, the victim was now behind the front tires between the front tire and the rear tires. And then it pulled forward a little bit more to where it came to rest." *Id.* Kempe was "under the rear axle" when the vehicle came to final rest. *Id.*

### 2. Field Sobriety and Drug Recognition Tests suggested Morrissette might have been impaired while driving the vehicle.

At the scene, Reno Police Officer German Rodriguez, who was recently certified as a Drug Recognition Expert (DRE), testified he observed Morrissette's eyelids were droopy, his speech was at first slow and became erratic, his face was red and blotchy, and his eyes were bloodshot. ECF No. 32-36 at 64, 78–80. Morrissette consented to a Field Sobriety Test (FST), which tests for impairment due to alcohol, and a DRE, which tests for drug impairment. *Id.*

Morrissette informed Rodriguez he took prescription clonazepam, a controlled substance, for anxiety and that he had suffered brain and back injuries; however, Rodriguez observed Morrissette walk "normal" without a limp or slump. *Id.* at 80–82. Morrissette's blood pressure was normal but his systolic (lower number) indicated impairment because it was above normal. *Id.* at 77, 91. Morrissette's pulse rate was slightly above a normal range of 60 to 90 beats per minute as he tested 92 and 94, which was a clue he might be under the influence of a stimulant, however, his pulse was a normal 88 on a third test. *Id.* at 85–87.

Morrissette exhibited two of the six clues for nystagmus, i.e., "lack of smooth pursuit" and "lack of convergence," indicating he might be impaired. *Id.*

at 77–79, 102. Morrissette's pupils, however, responded normally to changes in lighting conditions. *Id.* at 89–90, 104–05. Because Morrissette showed only two clues for nystagmus, Rodriguez could not say whether Morrissette was under the influence of a depressant. *Id.* at 102–03.

Morrissette was unbalanced and missed the heel-to-toe and walked off the line three times during the walk-and-turn test. *Id.* at 82–83. Morrissette indicated he might be impaired because he could not keep his balance during the one-leg test, put his foot down three times, and swayed while balancing on one leg, and Morrissette almost fell when asked to balance on the other leg. *Id.* at 83–84, 137–38. During the one-leg test, Rodriguez looked for Morrissette's ability to "multi-task" by asking him to count while standing on one leg, but the result indicated impairment. *Id.* When Morrissette could not keep his balance and multitask during the one leg test, he informed Rodriguez he had a preexisting knee injury. *Id.* at 81–84. During a Romberg test, Morrissette was asked to tilt his head back and imagine the passage of 30 seconds; and Morrissette responded by swaying more than two inches side to side and back and forth and imagined 30 seconds had passed after only 13 seconds, indicating impairment by stimulant. *Id.* at 85, 87–88. Morrissette also indicated impairment when he missed his nose three out of six times during the finger-to-nose test. *Id.* at 89.

The results of the FST and DRE informed Rodriguez's opinion that, under the totality of the circumstances, Morrissette "was impaired by stimulant and a depressant" and "unsafe to operate a motor vehicle." *Id.* at 64–76, 82–84, 88–92.

On cross-examination, Rodriguez admitted he performed only three DREs in the field prior to Morrissette and that it was fair to say Rodriguez was "pretty green" when he performed the DRE. *Id.* at 99. Rodriguez admitted his trial testimony was inconsistent with his testimony at preliminary examination. *Id.* at 92–104, 114–20. First, he was mistaken when he previously testified his tests

4

indicated Morrissette was not under the influence of a depressant. *Id.* at 94–96, 114. Second, he was mistaken when he previously testified the lack of convergence indicated impairment by a stimulant. *Id.* at 99–101, 114, 133. Third, he was mistaken when he previously testified Morrissette's leg injury could have caused Morrissette's impaired performance during the walk-and-turn test. *Id.* at 111–14, 148. Fourth, he was mistaken when he previously testified the lack of nystagmus indicated Morrissette was not under the influence of a depressant. *Id.* at 103–04, 114. Finally, although he previously testified Morrissette's back injury could have affected Morrissette's performance of the Romberg test, he testified at trial that, based on his observations, Morrissette "didn't have a severe back injury." *Id.* at 117–18.

On redirect examination Rodriguez clarified that, during his DRE training, he performed 12 full mock DREs and that he had also performed FSTs for two weeks in a wet laboratory. *Id.* at 124–27. He changed his testimony at trial to say Morrissette was under the influence of, not only a stimulant, but a depressant, because, after the preliminary examination, he discovered clonazepam can cause "drunken-like behaviors." *Id.* at 96–98, 101, 108–09, 130–33. He also learned that lack of smooth pursuit is a clue to a depressant. *Id.* at 134.

### 3. Morrissette's urine contained three controlled substances but did not indicate impairment.

Washoe County Sheriff's Department Criminalist Rachelle Spear testified that urine test results cannot be used to determine whether Morrissette was impaired at the time he was behind the wheel of the car. *Id.* at 205. The purpose of the urine test is to show drug use, not impairment, because it "doesn't necessarily point to what's floating around in the subject's brain, so it's not going to tell you necessarily impairment or whether the person was out of their mind." *Id.* at 181. A urine test can show what substances were used "in the recent past" but does not tell you *when* they were used. *Id.* Insofar as determining

impairment, blood is the superior specimen, because, unlike urine, it shows what is in the blood and brain. *Id.* at 206. Spear testified Morrissette's urine tested positive for recent use of amphetamine, methamphetamine, and cocaine and the levels were over the *per se* limit under Nevada law, i.e., (1) 590 nanograms of amphetamine per millimeter of urine (over Nevada's *per se* limit of 500); (2) 240 nanograms of cocaine metabolite (over Nevada's *per se* limit of 150); and (3) 2000 nanograms of methamphetamine per milliliter of urine (over Nevada's *per se* limit of 500). *Id.* at 189, 192–96.

### 4. Morrissette's blood tested positive for a therapeutic dose of clonazepam but was negative for illegal drugs.

Sheriff's Department Forensic Scientist Dan McDonald explained that anything below the "per se" limits for concentration of drugs in blood and urine "doesn't really mean much when it comes to impairment." ECF No. 32-40 at 27. For example, methamphetamine has effects only when it is in the blood stream, which takes it to the brain, and causes no impairment once inside the bladder. ECF No. 32-36 at 229. The bar is set just below the per se limits when testing for drugs. ECF No. 32-40 at 61–62. McDonald detected no illegal street drugs in Morrissette's blood. *Id.* at 67. McDonald, however, detected in Morrissette's blood a therapeutic level of 18 nanograms per milliliter of clonazepam and 52 nanograms of amino clonazepam per milliliter.[3] ECF Nos. 32-36 at 219, 253; 32-40 at 13, 22.

Clonazepam is an "anti-depressant, anti-anxiety" medication that is "widely prescribed." ECF No. 32-36 at 225–26. Common side effects of clonazepam include "drowsiness, dizziness, and impaired coordination, walking, coordination issues," which could impair driving, and loss of memory, and

---

[3] McDonald explained that Morrisette's blood contained a therapeutic dosage, because a therapeutic dose range is between seven and 75 nanograms per milliliter of blood and one does not add the 18 and 52 to arrive at a dose of 70. ECF Nos. 32-36 at 262; 32-40 at 2, 6–7, 67–68.

depression. ECF Nos. 32-36 at 234–35, 238, 259–60; 32-40 at 16. McDonald explained that an individual taking a therapeutic level "could be completely normal" or "could be impaired." ECF No. 32-40 at 23.

McDonald testified that nystagmus, the ability of the eye to smoothly move back and forth, lack of convergence, "a bad reaction to light," lower pulse, and lower blood pressure, are consistent with symptoms of clonazepam. *Id.* at 14–15. "Clonazepam can slow your thinking and motion," can impair driving, and individuals should not "operate heavy machinery or other dangerous activities" until they know how clonazepam affects them. *Id.* at 46, 65–66.

## B. Procedural Summary

Following the jury's verdict convicting Morrissette of Causing the Death of Kempe by Driving or Being in Actual Physical Control of a Vehicle while under the Influence of a Controlled Substance and/or Prohibited Substance in violation of NRS § 484C.430, the state district court sentenced him to 8 to 20 years imprisonment. ECF Nos. 9-3; 32-26; 32-42. Morrissette unsuccessfully sought relief in the state courts on direct appeal and in postconviction proceedings. ECF Nos. 9-7; 9-16; 9-19.

## III.   GOVERNING STANDARDS FOR REVIEW

### A. Antiterrorism and Effective Death Penalty Act (AEDPA)

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
>> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

7

1  28 U.S.C. § 2254(d).

2  A state court's decision is contrary to clearly established Supreme Court

3  precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court applies

4  a rule that contradicts the governing law set forth in [Supreme Court] cases" or

5  "if the state court confronts a set of facts that are materially indistinguishable

6  from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73

7  (2003) (first quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and then

8  citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an

9  unreasonable application of clearly established Supreme Court precedent within

10  the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct

11  governing legal principle from [the Supreme] Court's decisions but unreasonably

12  applies that principle to the facts of the prisoner's case." *Id.* at 75.

13  The Supreme Court has instructed that "[a] state court's determination

14  that a claim lacks merit precludes federal habeas relief so long as 'fairminded

15  jurists could disagree' on the correctness of the state court's decision."

16  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*,

17  541 U.S. 652, 664 (2004)).

18  **B. Standards for Evaluating Ineffective Assistance of Counsel (IAC)**

19  An IAC claim requires a petitioner demonstrate (1) the attorney's

20  "representation fell below an objective standard of reasonableness[;]" and (2) the

21  attorney's deficient performance prejudiced the petitioner such that "there is a

22  reasonable probability that, but for counsel's unprofessional errors, the result of

23  the proceeding would have been different." *Strickland v. Washington*, 466 U.S.

24  668, 687–88, 694 (1984). "Unless a [petitioner] makes both showings, it cannot

25  be said that the conviction . . . resulted from a breakdown in the adversary

26  process that renders the result unreliable." *Id.*

27  A petitioner who makes an IAC claim "must identify the acts or omissions

28  of counsel that are alleged not to have been the result of reasonable professional

8

judgment." *Strickland*, 466 U.S. at 690. A court considering an IAC claim, "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689. Thus, when considering IAC claims, a court is obliged to "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. "In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Id.* at 690. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

In establishing there is a reasonable probability the result of the trial would have been different, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112; *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). A petitioner must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"

1    and "counsel's errors were so serious as to deprive the defendant of a fair trial,

2    a trial whose result is reliable." *Strickland*, 466 U.S. at 687–88. The burden is on

3    the petitioner to overcome the presumption that counsel made sound trial-

4    strategy decisions. *Harrington*, 562 U.S. at 104.

5        In *Harrington*, the Supreme Court clarified that *Strickland* and § 2254(d)

6    are each highly deferential, and when the two apply in tandem, review is doubly

7    so. *See Harrington*, 562 U.S. at 104–05. *See also Cheney v. Washington*, 614 F.3d

8    987, 995 (9th Cir. 2010) (internal quotation marks omitted). The Court further

9    clarified, "[w]hen § 2254(d) applies, the question is not whether counsel's actions

10   were reasonable. The question is whether there is any reasonable argument that

11   counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

12   ### C. Standards for Evaluating Procedurally Defaulted IAC Claims

13       "A federal habeas court generally may consider a state prisoner's federal

14   claim only if he has first presented that claim to the state court in accordance

15   with state procedures." *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022). Where a

16   petitioner fails to do so and therefore "has defaulted his federal claims in state

17   court pursuant to an independent and adequate state procedural rule," federal

18   habeas review "is barred unless the prisoner can demonstrate cause for the

19   default and actual prejudice as a result of the alleged violation of federal law, or

20   demonstrate that failure to consider the claims will result in a fundamental

21   miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

22       For claims of ineffective assistance of trial counsel, petitioners may

23   establish cause, thereby excusing a petitioner's procedural default where (1) the

24   claim of ineffective assistance of trial counsel is a "substantial" claim; (2) the

25   "cause" consists of there being "no counsel" or only "ineffective" counsel during

26   the state collateral review proceeding; (3) the state collateral review proceeding

27   was the "initial" review proceeding in respect to the "ineffective-assistance-of-

28   trial-counsel claim"; and (4) state law requires that an "ineffective assistance of

trial counsel [claim] . . . be raised in an initial-review collateral proceeding." *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez v. Ryan*, 566 U.S. 1, 14, 18 (2012)).[4]

In *Martinez*, the Supreme Court cited the standard for issuing a Certificate of Appealability (COA) as analogous support for whether a claim is substantial. *See Martinez*, 566 U.S. at 14. According to the COA standard, a claim is substantial if a petitioner shows "reasonable jurists could debate whether . . . the [issue] should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). An ineffective-assistance-of-trial-counsel claim "is insubstantial" if it lacks merit or is "wholly without factual support." *Martinez*, 566 U.S. at 14–16 (citing *Miller-El*, 537 U.S. 322).

"[T]he standard for evaluating the underlying trial counsel IAC claim during the *Martinez* prejudice analysis is not as stringent as that required when considering the merits of the underlying [*Strickland*] claim." *Leeds v. Russell*, 75 F.4th 1009, 1017–18 (9th Cir. 2023) (citing *Michaels v. Davis*, 51 F.4th 904, 930 (9th Cir. 2022) ("[A] conclusion on the merits of [a trial counsel IAC] claim under *Strickland* holds a petitioner to a higher burden than required in the *Martinez* procedural default context, which only requires a showing that the [trial counsel IAC] claim is 'substantial.'")). Review of trial counsel's actions in a *Martinez* prejudice analysis is conducted under a relaxed standard, while the *Strickland* standard is applied with full force when considering actions of postconviction review counsel under a *Martinez* analysis. *See Leeds*, 75 F.4th at 1022.

"The analysis of whether both cause and prejudice are established under *Martinez* will necessarily overlap, 'since each considers the strength and validity

---

[4] Nevada prisoners are required to raise IAC claims involving trial counsel in an initial state postconviction petition, which is the initial collateral review proceeding for purposes of applying *Martinez*. *See Rodney v. Filson*, 916 F.3d 1254, 1259-60 (9th Cir. 2019).

of the underlying ineffective assistance claim.'" *Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019). On all such issues, if reached, the Court's review is *de novo. See, e.g., Detrich v. Ryan*, 740 F.3d 1237, 1246–48 (9th Cir. 2013); *Atwood v. Ryan*, 870 F.3d 1033, 1060 n.22 (9th Cir. 2017).

**D. Applicable State Law**

At the relevant time, NRS § 484C.430(1) stated:

> 1.[A] person who:
>
> ....
>
>> (d) Is under the influence of a controlled substance or is under the combined influence of intoxicating liquor and a controlled substance;
>>
>> . . . . or
>>
>> (f) Has a prohibited substance in his or her blood or urine in an amount that is equal to or greater than the amount set forth in subsection 3 of NRS 484C.110,
>
> and does any act or neglects any duty imposed by law while driving or in actual physical control of any vehicle on or off the highways of this State, if the act or neglect of duty proximately causes the death of, or substantial bodily harm to, another person, is guilty of a category B felony . . . .

NRS § 484C.430(1)(d) and (f), *as substituted by* 2009 revision for NRS § 484.3795. At the relevant time NRS § 484C.110(3) stated:

> 3. It is unlawful for any person to drive or be in actual physical control of a vehicle on a highway or on premises to which the public has access with an amount of a prohibited substance in his or her blood or urine that is equal to or greater than:

| Prohibited substance | Urine | Blood |
|---|---|---|
| | Nanograms | Nanograms |
| | per milliliter | per milliliter |
| (a) Amphetamine | 500 | 100 |
| (b) Cocaine | 150 | 50 |
| . . . . | | |
| (i) Methamphetamine | 500 | 100 |

NRS § 484C.110(3)(a), (b) and (i), *as enacted by* 2009 revision for NRS § 484.379.

12

1  **IV.   DISCUSSION[5]**

2       Ground 1 of the Petition alleges trial counsel provided ineffective assistance

3  in violation of the Sixth and Fourteenth Amendments and Ground alleges

4  cumulative error violated Due Process.

5       **A. Ground 1(A)—Failure to Hire and Present Reconstruction Expert.**

6       Morrissette alleges trial counsel was ineffective because he failed to hire

---

[5] In the Second Amended Petition, Morrisette states the standard of review proscribed by 28 U.S.C. § 2254(d) violates the U.S. Constitution, specifically the Suspension Clause (Article One, Section Nine, clause two); fundamental principles of separation of powers (Articles One, Two, Three); the ban on cruel and unusual punishments (Amendments Eight and Fourteen); and the guarantee of due process (Amendments Five and Fourteen). ECF No. 24 at 9. Respondents oppose these claims in their Answer to the petition. ECF No. 53 at 9. Morrisette conceded in the Second Amended Petition that the Ninth Circuit Court of Appeals rejected arguments that AEDPA violates the Suspension Clause and separation of powers doctrine. ECF No. 24 at 9 (citing *Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007)). Rule 2(c) of the Rules Governing Section 2254 Cases requires a federal habeas petition specify all grounds for relief and "the facts supporting each ground." Conclusory allegations unsupported by specific facts may be summarily dismissed. *Mayle v. Felix*, 545 U.S. 644, 649, 655–56 (2005); *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Morrisette failed to specify facts or law in the Petition to support these allegations.

In his Reply, Morrissette advances brand new arguments not contained in his Petition in support of his claim that AEDPA is unconstitutional, i.e., he claims that 28 U.S.C. § 2254(d) is unconstitutional under the Supreme Court's recent decision in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), because the independent federal judiciary cannot defer to other tribunals on legal questions; deference under 28 U.S.C. § 2254(d) is inconsistent with an independent federal judiciary; and deference under 28 U.S.C. § 2254(d) isn't a mere remedial limitation. ECF No. 72 at 14–24. *But see, e.g., Miles v. Floyd*, No. 24-1096, 2025 WL 902800, at *3 (6th Cir. Mar. 25, 2025) (declining to hold *Loper Bright* impliedly overturned AEDPA deference).

The Court declines to consider Morrissette's new arguments raised for the first time in his counseled reply brief. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994); *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("[r]eply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration."); *see id.* (holding that, because the non-moving party ordinarily has no right to respond to the reply brief, as a matter of litigation fairness and procedures, the new argument raised in the reply brief was necessarily treated as waived). *See also* Local Rule LR 7-2(b) ("Surreplies are not permitted without leave of court; motions for leave to file a surreply are discouraged.").

Based on the foregoing, the Court dismisses these claims with prejudice as conclusory and without merit and denies a COA.

13

an accident reconstruction expert and/or have that expert testify at trial. ECF No. 24 at 11–12. He argues that, had the jurors considered expert testimony that the sun glare prevented Morrissette from seeing Kempe, the jury could have determined there is reasonable doubt whether Morrissette did an act or neglected a duty imposed by law while driving or in actual physical control of his vehicle that proximately caused the collision, for purposes of the conviction under NRS § 484C.430(1). *Id.* Respondents argue counsel properly chose not to hire an accident reconstruction expert for trial. ECF No. 53 at 17.

### 1. Additional Background

Morrissette did not testify, but there was testimony he told police he did not see Kempe. ECF No. 32-35 at 13, 18–19. Officer McMillin testified he was trained in accident reconstruction, and provided his observations of the sun and shadows in surveillance photographs and at the scene a few minutes after the collision, and, stated that, although the sun did not affect his visibility when he entered the parking lot, he could not say it would not affect others:

[BY DEFENSE COUNSEL]:

Q    Tell me about the sun[-]shade line.

A    It was partially back in the driveway. I couldn't tell you how far without actually looking at the video.

Q    When the vehicle is coming off of Arlington into the parking lot as this vehicle did, which way is the vehicle pointing as it enters the parking lot?

A    It would have been pointing west.

Q    Almost due west, right?

A    Yes.

Q    Because Arlington is kind of a north-south almost on the compass line, isn't it?

A    Yes, sir.

Q    So what time did this happen?

A    It was five something at night.

Q    Do you know what time the sun set on that day?

A    On that day, no.

Q    Do you know where the sun was in the sky relative to how many stories the motel is?

14

A    I remember seeing it up above the building, but I couldn't tell you how high up in the sky it was.

Q    So when you got there the sun is still up. It is not hidden behind the building?

A    No.

Q    So someone pulling off Arlington going due west is looking into the sun?

A    Could have been, yes.

. . . .

[BY THE STATE]:

Q    And what time did the accident occur?

A    1714 which is 5:14 p.m.

Q    And [defense counsel] asked you if—where the sun was when you arrived on the scene. You said it was above the building.

A    Yes, sir.

Q    And you also, when asked by the State, stated that you were not the first officer on the scene; is that accurate?

A    That is correct.

Q    So some time likely lapsed from the time that the accident occurred and the time that you arrive on scene. Is that safe to say?

A    A couple minutes because I was at something like Fourth and Sierra when the call came out.

Q    And yet the sun was still above the building?

A    Yes.

Q    When you pulled into the parking lot, which direction did you pull in?

A    Same direction.

Q    Same direction. So off of Arlington?

A    Yes.

Q    Did you have any difficulty seeing anyone or anything when you pulled in?

A    No.

. . . .

[BY DEFENSE COUNSEL]:

Q    You are not going to testify that anybody else may have been distracted by the sun, right? You are just testifying as to your own experience when you pulled in.

A    Correct.

Q    You can't say whether ten other people pulling in would or would not have been affected by the sun, correct?

A    That is correct.

1  *Id.* at 38–39, 65–70.

2      The parties later discussed, outside the presence of the jury, the State's

3  desire to elicit testimony from Reno Police Officer Mueller that Nevil told him the

4  sun was not in her eyes. ECF No. 32-36 at 46–55. Defense counsel argued there

5  is no such statement in the transcript of Nevil's interview; however, the State

6  explained that, although the interview transcript omitted that statement in the

7  interview, it can nonetheless be heard on the audio recording of the interview.

8  *Id.* at 40–42. Defense counsel assumed the transcript was correct and did not

9  compare the transcript with the audio recording. *Id.*

10      The audio recording of Nevil's interview was played for the trial court. *Id.*

11  at 55. The State argued Mueller "specifically asked, 'Is the sun in your eyes,' she

12  said, 'I don't think so, no. I don't think so, no.'" *Id.* The trial court acknowledged

13  that part of Nevil's statement was omitted from the transcript. *Id.* The State and

14  the trial court acknowledged everything else was in the transcript and defense

15  counsel stated it seemed "odd that that's missing." *Id.* at 56.

16      Defense counsel argued the State did not specifically ask Nevil on direct

17  examination (she was subpoenaed as a witness for the State) whether the sun

18  was in her eyes and therefore the State could not attempt to impeach her with

19  her statement to Mueller. *Id.* Counsel argued Nevil's statement to Mueller was

20  not inconsistent with her testimony and asking the question of Mueller prevented

21  the defense from rehabilitating Nevil on cross-examination. *Id.*

22      The State argued that, if it was unable to ask Mueller about Nevil's

23  interview statement, it would elicit in rebuttal Nevil's remark during a jail call

24  about the sun being in her eyes, and defense counsel responded by stipulating

25  he would not argue the sun was a contributing factor:

26          [THE STATE]: Judge, I think that the concern is there has been no
        evidence of an intervening cause in this case, the sun brought in.

27          There was some cross examination of Officer McMill[i]n about the
        sun being above the building. But officer Mcmill[i]n said the sun was

28          not in his eyes when he entered the parking lot.

1
2
3
4

   It was ten minutes later. The sun would have been lower. Our concern is, if that's going to be an argument being made on facts that haven't been in evidence, we would like to get ahead of the storm and say, look, not only did Laura Nevil not say that the sun was distracting her at the time, which was inconsistent, because she said she didn't remember and, too, there is a jail call where the defendant specifically says something to the effect of like, "You know what to say."

5
6

   She says, "Oh, yeah, honey. The sun was in my eyes. Ha, ha, ha." And that's the main concern that we have.

7

   And so long as they are willing to say, look, the sun isn't a factor in the case, we certainly don't want to bring it in ourselves.

8

   That's really the main concern I think for us.

9

[DEFENSE COUNSEL]: I'll stip that we are not going to argue that he was blinded by the sun.

10

*Id.* at 56–57.

11   At the state postconviction evidentiary hearing, defense counsel testified

12 Morrissette "was interested in blaming the victim and blaming the sun, but on

13 further discussion with [counsel] he agreed that that was not a good strategy in

14 front of the jury."[6] ECF No. 34-27 at 89–90. Counsel conceded this agreement

15 was made without consulting an accident reconstructionist. *Id.* Counsel said a

16 determination that the sun was a major factor in the crash would not have

17 changed counsel's defense. *Id.* Counsel made a strategic decision to avoid the

18 risk of undermining the jury's sympathy and willingness to disregard the urine

19 evidence:

20
21
22

  Q  Well, let's suppose that an accident reconstructionist had looked at the facts of the case and determined the sun was a major factor in the crash. Would that have changed your approach in defending Mr. Morrissette?

  A  No.

23

  Q  Let us suppose further that the expert, an accident

24
25
26
27
28

---

[6] Morrissette testified at the postconviction evidentiary hearing that, when he first met trial counsel, he told counsel he was "temporarily blinded" as he pulled into the parking lot and did not see Kempe. ECF No. 34-27 at 67. Morrissette said he brought the idea of hiring a reconstruction expert to trial counsel's attention, and counsel responded, "Don't worry, I got this, you know, I'll take care of this." *Id.* at 68. Morrissette learned counsel did not hire an accident reconstruction expert "right before" trial. *Id.* at 69. Morrissette did not tell counsel to stipulate, or consent that, he was not blinded by the sun or that Kempe was not to blame for the accident. *Id.* at 68.

reconstructionist, had determined that the victim had about four seconds to avoid impact, the victim's back was to the sun, the victim was where she could see Mr. Morrissette clearly, but the sun was straight in Mr. Morrissette's eyes until about a second before the crash shadow line came up about a second before the crash, there were no skid marks or scuff marks, but if he'd slammed his brakes, he still likely would have hit her.

If you had that information, would that have changed your approach to defending the case?

A    No.

Q    Why not?

A    The case was about the per se on the one level, so irregardless [sic] of how it happened, it happened.

Secondly, it was strategic in order to get the jury to discount the urine test, not to have them believe that Mr. Morrissette was trying to blame others or not accept responsibility, which would impact any sympathy or likability that they might have regarding Mr. Morrissette for them to be willing to consider the urine test as not to be considered in the case.

. . . .

*Id.* at 90–91. Counsel's testimony indicated some confusion about the requirements of proximate cause:

Q    All right, [y]ou agree that the state has the burden of proof beyond a reasonable doubt that the defendant was impaired due to alcohol or cocaine or methamphetamine or clonazepam, correct?

A    Correct.

Q    You also agree that the state has the burden of proof that the defendant violated a duty imposed on him and that was the proximate cause of the crash.

A    I'm not sure proximate cause. I consider that a civil legal term. I'm not quite sure if you and I are speaking the same language.

Q    Did you read 484(C)—I think it's point 420—in preparing for trial?

A    I don't recognize that reference sitting here but I read whatever was relevant.

Q    I'm sorry. I misspoke. 484(C).430. Did you go over the statute that Mr. Morrissette was charged with before forming your theory of defense?

A    Yes.

Q    Okay. So, you knew that the state had to prove that Mr. Morrissette did an act or neglected a duty imposed on him, right?

A    Are you reading from the statute?

18

| | | |
|---|---|---|
| Q | | Yeah. |
| A | | Yes, I would know whatever was in the statute. |
| Q | | And you would know that if that act or neglect of duty proximately caused the death of another, that the state would have to prove that. |
| A | | Yes. |

*Id.* at 91–92. Defense counsel testified he was aware that the sun glare was an issue and that Morrissette blamed the sun:

| | | |
|---|---|---|
| Q | | Okay. If you thought the state had problems both proving impairment and proving proximate cause, wouldn't you want to present both defenses? |
| A | | If I thought that, I would, yes. |
| Q | | Okay. But by choosing not to do an accident reconstruction, you didn't know whether you had the evidence to establish that the state could not prove proximate cause beyond a reasonable doubt. |
| | | Is that correct? |
| A | | That is not correct. The idea of the sun being in his eyes was—whether he had an accident reconstructionist say the sun was in his eyes or not, that was certainly something that was—that I was aware of. |
| Q | | Okay. You're aware from an RPD report, I think from Officer Mueller [sic], indicating that the sun may have been a factor. Do you recall that? |
| A | | I don't remember how he stated it, but he did acknowledge that the sun was in the western sky and that he was heading west and it was at a level that certainly would have been shining in the direction he was coming, yes. I don't remember exactly how he stated it but he did bring it up. |
| Q | | Okay. Did Mr. Morrissette tell you his recitation of the facts to you that the sun was in his eyes and he couldn't see Ms. Kemp at the time of the crash? |
| A | | I don't recall it being that specific other than he did want to blame the sun. |
| Q | | And you don't remember why—you don't remember now why he wanted to blame the sun? |
| A | | Oh, he wanted to blame the sun. The sun was the cause of the accident, not him. |

*Id.* at 93–94. Counsel testified he did not believe it was possible to establish that Morrissette was not the proximate cause of the accident; however, it was possible it could have been established through sources other than Morrissette, that Morrissette was unable to see Kempe until a second or so

before the collision:

> Q    Okay. Would you agree with me that, if you'd decided to go the route of trying to establish a lack of proximate cause, that you could have done that without Mr. Morrissette's testimony?
>
> A    I don't know that you could have established that in any fashion with or without his testimony nor would it help in his defense to try to do that.
>
> . . . .
>
> Q    [W]ould you agree that the sun being a major factor, that him not being able to see the victim until a second or so before the crash, all of that could have been established through sources other than Mr. Morrissette so you wouldn't need to call him to establish that?
>
> A    Possibly.

*Id.* at 101–102. Counsel testified he decided before trial not to pursue a defense that the sun was in Morrissette's eyes, but that the issue of influencing Nevil was an additional reason not to use it. *Id.* at 97–98, 102.

At the postconviction evidentiary hearing, accident reconstruction expert, Kenneth Buchner, opined, "that Mr. Morrissette was not able to see [Kempe] because he was being—because of the sun glare shining in his eyes, he could not see her." *Id.* at 37. His opinion is based on a reconstruction of the accident that took into consideration, among other things, the photographs of the collision, statements of witnesses and trial testimony, the U.S. Naval Observatory's publication of the azimuth and altitude for the sun, the actual vehicle that Morrissette drove, Morrissette's physical measurements, and approximations of the average walking speed of a woman over 60 (Kempe) and that Morrisette was driving at 10 to 15 miles per hour. *Id.* at 16–25. Buchner estimated that after Morrissette finished his turn into the driveway, he had 13 yards before he collided with Kempe, and that he was unable to see her "just before" he hit her "simply because she was in the shadows and he was in the bright sunlight." *Id.* at 23, 37.

Buchner also observed that, based on the photographs, it appeared that Kempe was struck "on the left front corner approximately at the edge of the

headlight," was "somewhat rolled onto the hood" and at the same time, the "shadow line" appeared "right at the top of the roof edge and the windshield." *Id.* at 32–34, 44. He estimated one-second passed between the shadow line's appearance and the impact. *Id.* at 34–35. He opined that, had Morrissette seen Kempe when the shadow line first came up, and slammed on the brakes, he still would have hit her. *Id.* Buchner estimated Kempe had approximately four seconds to avoid the collision if she was looking up and straight at Morrissette's vehicle, although it appeared she was looking down before the collision. *Id.* at 26–28. His estimate assumes Kempe was able to see the vehicle from about 90 to 100 feet, which would have given her a clear unobstructed view of the vehicle as her back was to the sun. *Id.*

On cross-examination, Buchner agreed that a driver's ability to react can be affected by their having a conversation, and having taken benzodiazepine, but that drivers can counteract the glare of the sun by wearing sunglasses, lowering the visor, and driving more slowly. *Id.* at 39–40. Buchner agreed it was his opinion the "sun glare was a large contributing factor in the crash" but he did not know if it was "the only contributing factor." *Id.* at 38.

### 2. State Court Decision

The Nevada Court of Appeals (NCA) held:

> Morrissette argues the district court erred by denying his claims of ineffective assistance of trial counsel raised in his November 29, 2016, petition and later-filed supplements. To demonstrate ineffective assistance of trial counsel, a petitioner must show counsel's performance was deficient in that it fell below an objective standard of reasonableness and prejudice resulted in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Warden v. Lyons*, 100 Nev. 430, 432–33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*). Both components of the inquiry must be shown, *Strickland*, 466 U.S. at 687, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State*, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166

(2005).

. . . .

> [M]orrissette argued his trial counsel was ineffective for failing to retain an accident reconstruction expert in an effort to show that Morrissette was not the proximate cause of the accident. Morrissette contended an accident reconstruction expert would have demonstrated that the accident was actually caused by either the angle of the sun or by the victim. At the evidentiary hearing, counsel testified that he and Morrissette decided that an attempt to blame either the sun or the victim for the accident would not be a successful trial strategy. Counsel testified that he believed that the jury would not be sympathetic to Morrissette if they had attempted such a strategy. The district court found counsel's testimony was credible. Morrissette failed to demonstrate counsel's performance fell below an objective standard of reasonableness. *See Ford v. State*, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989) ("Tactical decisions are virtually unchallengeable absent extraordinary circumstances."). Therefore, we conclude the district court did not err by denying this claim.

ECF No. 9-16 at 2–4.

### 3. Deferential Analysis of *Strickland* Deficiency Prong

The NCA's determination that counsel's strategy decisions, that a proximate cause defense based on the sun's glare would not be successful or that the jury would not be sympathetic, constitutes an objectively unreasonable application of *Strickland's* deficiency standard to the facts in Morrissette's case.

To convict Morrissette of Causing the Death of Another by Driving or Being in Actual Physical Control of a Vehicle while under the Influence of a Controlled Substance and/or Prohibited Substance, the State had to prove beyond a reasonable doubt:

> (1) Morrissette was driving a vehicle;
>
> (2) Morrissette while driving:
>
>> (a) was under the influence of controlled substance to a degree which rendered him incapable of safely driving the vehicle; or
>>
>> (b) had a prohibited substance in his blood or urine in an amount that is equal to or greater than the amount set by law; and
>
> (3) did an act or neglected a duty imposed by law while driving a vehicle;

22

(4)  the act or neglect of duty proximately caused;

(5)  the death of Kempe.

*See* NRS § 484C.430. *See also* ECF No. 32-37 at 18. The jury was instructed on the element of proximate cause, and that Morrissette could only be exculpated if a superseding cause was the sole cause of Kempe's death:

> "Proximate cause" is that cause which is natural and a continuous sequence, unbroken by any other intervening causes, that produces the injury and without which the injury would not have occurred.
>
> A proximate cause of an injury can be said to be that which necessarily sets in operation the factors that accomplish the injury.
>
> . . . .
>
> The contributory negligence of another is not an intervening cause, and therefore does not exonerate the defendant unless the other's negligence was the sole or superseding cause of injury.
>
> A criminal defendant can only be exculpated where, due to a superseding cause, he was in no way the "proximate cause of the result."

ECF No. 32-37 at 18, 28, 30. *See also Williams v. State,* 118 Nev. 536, 550, 50 P.3d 1116, 1125 (2002).[7]

Counsel testified his reasons for foregoing investigation of the sun's glare as a superseding proximate cause of the collision, were to avoid blaming Kempe, avoid the appearance that Morrissette took no responsibility for the collision, and avoid harming the jury's sympathy toward Morrissette about the urine test results. *See supra* at pp. 17–20. Fairminded jurists would agree that, although there may be reasonable justification not to blame Kempe for the collision, these are not "reasonable professional judgments" under the circumstances of the case that render reasonable counsel's failure to investigate whether the sun's glare constituted an independent and sole proximate cause of Kempe's death. Likewise, counsel's strategy, as demonstrated by his trial argument, that the

---

[7] *Williams* addressed NRS § 484.379(3), later codified as NRS § 484C.110(3).

State failed to prove Morrissette's ingestion of clonazepam was a sole proximate cause of the collision, does not make reasonable the failure to investigate the sun's glare as a sole superseding proximate cause of the collision. *See Strickland*, 466 U.S. at 691. Sober or not sober, if Morrissette could not see Kempe due to the sun's glare, the sun's glare could be perceived as a sole superseding proximate cause of the collision. And, whether the sun's glare posed an impediment to Morrissette's line of sight into the parking lot driveway, where Kempe was standing when she was struck,[8] is an independent circumstance that would cast no aspersions on either Kempe or Morrissette and posed the prospect of a proximate cause superseding whether Kempe was to blame, Morrissette was to blame for being under the influence of clonazepam, or both contributed to the collision. Based on Morrissette's claims and Officer McMillin's observations, all objectively reasonable criminal defense attorneys would investigate whether there was a scientific basis to contend the sun's glare could have been a sole superseding proximate cause of the collision.

Fairminded jurists would agree that counsel's assessment that Morrissette lacked credibility provided no reasonable basis to render investigation of the defense unnecessary under the circumstances known to counsel. To be successful, a defense based on the sun glare would probably require Morrissette's testimony as there is nothing in the trial record establishing that Morrissette was looking through his windshield (and not looking elsewhere) at the time of the collision. However, all objectively reasonable criminal defense attorneys would agree, that, where a defendant exhibits a lack of credibility, the presentation of corroborating testimony of independent third parties, including experts, can lend credibility to a defendant's version of events.[9] Here, Officer

---

[8] *See* ECF No. 72 at 1–8.

[9] The Court notes defense counsel did not testify that he made a strategic decision not to hire a reconstruction expert out of fear that an expert would say the sun

Laskin testified Morrissette claimed he did not see Kempe, and Officer McMillin's testimony suggested sun glare could have prevented Morrisette from seeing Kempe. An expert opinion based on scientific experiment, such as Buchner's, could have bolstered the credibility of the sun glare as a cause of the collision.

Respondents argue counsel's strategy was objectively reasonable because presentation of an accident reconstruction expert would open the door to damaging evidence. Fairminded jurists would agree the alleged evidence had no reasonable likelihood of affecting the testimony of an accident reconstructionist, Officer McMillin, or Morrissette, concerning proximate cause based on the sun. First, Nevil initially told police Morrissette was looking straight ahead when they entered the parking lot and that she was looking out the passenger window. At trial, however, Nevil was adamant she did not see where Nevil was looking because she was looking out the passenger window. Nevil's testimony could be construed as supporting, but not negating, a claim the sun was in Morrissette's eyes. Second, police asked Nevil whether the sun was in "her eyes" and she replied "I don't think so, no. I don't think so, no." It is reasonable to conclude that, because Nevil was looking out the passenger window, the sun would not be in her eyes. Finally, the State argued there was potential evidence of a jail call in which Morrissette said something like, "You know what to say," and Nevil replied, "Oh, yeah, honey. The sun was in my eyes. Ha, ha, ha." Trial counsel testified the discovery of the jail call indicated Morrissette attempted to influence a witness and solidified his decision to not raise a sun-glare defense, even though counsel had never investigated the sun glare defense. ECF No. 34-27 at 97–98. The jail call carried little weight as evidence that Morrissette attempted to

could not have been in Morrissette's eyes or because he had other articulated reasons to doubt Morrissette's claim, such as a lack of funds. *See e.g.*, *Harrington*, 562 U.S. at 108 (acknowledging that an attorney need not pursue an investigation that would be fruitless or harmful to the defense or where defense counsel has reasons to doubt the claim) (citing *Strickland*, 466 U.S. at 691).

influence Nevil's testimony because Nevil gave no testimony the sun was in Morrissette's eyes, and Nevil's testimony was consistent with her prior statements to the police.

For the above reasons, the NCA's determination that counsel's failure to hire an accident reconstruction expert did not fall below an objective standard of reasonableness under the totality of the circumstances known to counsel at the time, constitutes an objectively unreasonable application of *Strickland's* deficiency standard to the facts in the case.[10]

### 4. *De Novo* Review of *Strickland* Prejudice Prong

As the NCA did not adjudicate prejudice, this Court applies *de novo* review to *Strickland's* prejudice prong. But for counsel's failure to investigate the sun's glare by hiring a reconstructionist, the jury would have received evidence that, as Morrissette claimed, the sun's glare prevented him from seeing Kempe. Buchner would have testified he could not say whether the sun's glare was the sole proximate cause of the collision, but that, due to the sun's glare and shadows, Morrissette had only one second of time to react to seeing Kempe and would have hit her even if he had seen her. Thus, a jury could reasonably conclude that, regardless of whether Morrissette was under the influence of clonazepam, the sun's glare presented a sole superseding proximate cause of the collision that resulted in Kempe's death. *Strickland*, 466 U.S. at 687–88. For the foregoing reasons, Ground 1(A) is granted.

### B. Ground 1(B)—Failure to Challenge Reliability of Urinalysis.

Morrisette alleges trial counsel was ineffective because he failed to file a motion to suppress or motion in limine to exclude the urinalysis results on the theory it was based on a first void of urine, which is inherently unreliable for

---

[10] Although counsel is "[e]ntitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies," *Harrington*, 562 U.S. at 107, there is nothing supporting such a finding or that Morrissette lacked funds to hire an accident reconstruction expert.

purposes of NRS § 484C.110(3). ECF No. 24 at 12–14. Respondents argue counsel's failure to challenge the reliability of the urinalysis evidence was strategic. ECF No. 53 at 19–20.

### 1. Additional Background

At the postconviction evidentiary hearing, trial counsel testified he did not consider the possibility of filing a motion in limine to exclude the urine:

> Q     Okay. Now, after Judge Polaha denied the suppression motion, did you consider the possibility of filing a motion in limine to keep out the urine because it was an unreliable methodology in determining impairment?
>
> A     If we didn't—if I didn't file a motion in limine, then I didn't, correct.
>
> Q     Okay. The record will reflect you did not, so the answer is no, you did not. Is that correct?
>
> A     That's correct.

ECF No. 34-27 at 83–85.[11]

At the postconviction evidentiary hearing, criminalist Dan McDonald testified that, when using urine, rather than blood, to test for impairment from alcohol, one might have the suspect void the bladder, wait a while, and then give a second void of the bladder because the second void might be a more "realistic estimate to what was going on in their system at that time," depending on the individual's hydration. *Id.* at 47–52.

### 2. State Court's Determination

The NCA determined counsel's performance was neither deficient nor prejudicial as Morrissette failed to prove that NRS § 484C.110(3) requires a urinalysis based on a second urine sample for the evidence to be considered reliable:

> [M]orrissette argued his trial counsel was ineffective for failing to move to preclude introduction of the urinalysis report on the ground that it was more prejudicial than probative. *See* NRS

---

[11] Defense counsel had moved to suppress the urinalysis results claiming NRS § 484C.110(3) is unconstitutional, not because the urinalysis results were unreliable. ECF No. 32-16.

48.035(1).

> [FN 1] "[E]vidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." NRS 48.035(1).

Morrissette contended that a urinalysis based on a first void urine sample is per se unreliable and counsel should have urged a construction of NRS 484C.110(3) that a urinalysis must be based on a second void urine sample. Morrissette did not demonstrate that NRS 484C.110(3) requires a urinalysis to be based off a second void urine sample in order for that evidence to be considered reliable. Therefore, Morrissette did not demonstrate counsel's failure to move to exclude the urinalysis fell below an objective standard of reasonableness or that Morrissette was prejudiced by it. Accordingly, we conclude the district court did not err by denying this claim.

ECF No. 9-16 at 3.

### 3. Deferential Review of *Strickland* Deficiency Prong

The NCA's determination is neither contrary to nor constitutes an unreasonable application of *Strickland's* deficiency prong. An objectively reasonable trial attorney for criminal cases could reasonably choose not to move to exclude the urine test results as inadmissible based on a theory that a second void is more reliable than a single void of urine.

As the NCA determined, there is no requirement under NRS § 484C.110(3) of a second urine specimen for purposes of meeting the *per se* requirements. *See supra*, at p. 12. Counsel could reasonably conclude a motion to exclude such evidence is futile because, even if a first void is not as reliable as a second void, a first void of urine is nonetheless relevant because it has a tendency to make the existence of controlled substances in Morrissette's urine more probable than without the evidence. *See* NRS § 48.015. Counsel could furthermore conclude the trial court would determine the reliability of the first urine test evidence affected the weight of that evidence rather than its admissibility. *See* NRS § 48.035(1)–(2). *See also Brown v. State*, 138 Nev. 464, 472, 512 P.3d 269, 277 (2022) (stating the Nevada Supreme Court has "[l]ong held that the weight to be given to admissible evidence is left to the jury's determination.") (citing *Wheeler v. State,* 91 Nev. 119, 120, 531 P.2d 1358, 1358 (1975) ("The jury is the sole and

28

exclusive judge of . . . the weight to be given the evidence.")). *See also, e.g., City of Elko v. Zillich*, 100 Nev. 366, 369–70, 683 P.2d 5, 7 (1984) (stating "the best evidence [of market value of real property in condemnation] is found in sales of comparable property within a reasonable time before the taking," but the trial court properly determined comparable sales outside that time period affected the weight of the evidence and not its admissibility). In Morrissette's case, this is precisely what trial counsel argued in summation. ECF No. 32-41 at 42–43 ("So when you weigh the evidence it is your option how much weight to give it. And if you don't give the urine results any weight or much weight, that's your prerogative."). Moreover, counsel could anticipate the trial court would conclude cross-examination was adequate to avoid misleading the jury.

Based on the claims presented, the NCA's determination that Morrissette did not establish trial counsel's failure to move to exclude the urine evidence fell below an objective standard of reasonableness, constitutes an objectively reasonable application of *Strickland*'s deficiency prong.[12] Accordingly, Ground 1(B) is denied.

### C. Ground 1(C)—Failure to Obtain Consent to Concessions

Morrisette alleges trial counsel provided ineffective assistance by failing to obtain Morrissette's consent before conceding neither the sun nor Kempe caused Kempe's death. ECF No. 24 at 14–16. This Court previously determined this claim is procedurally defaulted and deferred ruling on the default until review on the merits. ECF No. 51 at 7. Respondents argue Ground 1(C) is insubstantial and lacks merit because counsel strategically determined how to address negligence, the sun, and the victim. ECF No. 53 at 11–14.

---

[12] Morrissette argued in his reply brief that, but for counsel's failure to challenge the reliability of the State's collection and preservation of the urine evidence, there is a reasonable probability the jury would either have not considered or would have discounted the results of the urinalysis. ECF No. 72 at 40–42. These are new claims not raised in the Petition. ECF No. 24 at 12–14. The Court will not consider new claims raised in a reply brief. *See supra* at p. 13 n.5.

1      Trial counsel verbally stipulated, outside the presence of the jury, that the

2 defense would not argue Morrissette was blinded by the sun, and later stated

3 the defense had no interest in blaming Kempe for her death. ECF Nos. 32-36 at

4 57–58; 32-40 at 108.

5      Trial counsel testified at the postconviction evidentiary hearing that

6 Morrissette was "interested in blaming the victim and blaming the sun, but on

7 further discussion with me he agreed that that was not a good strategy in front

8 of the jury." ECF No. 34-27 at 89–90. Counsel testified he "made no effort to

9 blame the victim" and did not want to use the sun "as an excuse for the accident."

10 *Id.* at 89, 97. Counsel testified "We made the decision not to blame outside

11 sources or the actual physical contact regarding the car and the victim." *Id.*

12 Counsel said that decision was made before trial. *Id.* at 97–98, 102. Morrissette

13 testified he did not tell trial counsel to stipulate, and did not consent to stipulate,

14 that he was not blinded by the sun or that Kempe was not to blame for the

15 incident. *Id.* at 68, 74.

16      Morrissette fails to establish a substantial claim that counsel conceded the

17 State proved Morrissette neglected a duty that proximately caused Kempe's

18 death. In summation, defense counsel attacked the State's burden of proof for

19 the causation element by arguing Officer Rodriguez lacked credibility when he

20 concluded, based on his observations during the FTS and DRE, that Morrissette

21 "was impaired by stimulant and a depressant" and "unsafe to operate a motor

22 vehicle." ECF No. 32-41 at 35–41, 43–50, 52–54, 59–60. Counsel also elicited

23 Officer McMillin's testimony the sun may have affected visibility. And counsel

24 argued that, based on Morrissette's line of sight, this was an accident, and the

25 State failed to prove beyond a reasonable doubt that Morrissette neglected a duty

26 that caused Kempe's death. *Id.* at 36, 40. Morrissette also fails to establish a

27 substantial claim trial counsel failed to obtain Morrissette's consent not to blame

28 outside sources as counsel testified he discussed it with Morrissette and

1    Morrissette agreed not to pursue that strategy.[13]

2    Fairminded jurists would agree the claim in 1(C) is wholly without merit

3    and Morrissette fails to establish a substantial claim that trial counsel's

4    performance was deficient to overcome the procedural default. *Martinez*, 566

5    U.S. at 14–16. Ground 1(C) is dismissed with prejudice.[14]

6    **D. Ground 1(D)—Failure to Argue No Breach of Legal Duty**

7    Morrissette alleges trial counsel provided ineffective assistance by failing

8    to argue Morrissette did not breach a legal duty when he struck the victim. ECF

9    No. 24 at 16–17. He alleges trial counsel instead pursued a "jury nullification"

10    defense by arguing the jury should not find him impaired even though

11    Morrissette met the *per se* statutory requirement for impairment. *Id.* This Court

12    previously determined this claim is procedurally defaulted and deferred ruling

13    on the default until its review on the merits. ECF No. 51 at 7. Respondents argue

14    Ground 1(D) is insubstantial and lacks merit because trial counsel reasonably

15    refrained from arguing Morrissette did not breach a legal duty when he struck

16    the victim. ECF No. 53 at 14–15.

17    As discussed, trial counsel argued in summation that the State failed to

18    meet its burden to prove Morrissette neglected a duty that proximately caused

19    Kempe's death. ECF No. 32-41 at 35–41, 43–50, 52–54, 59–60. Moreover,

20

---

21    [13] The state district court found counsel's testimony credible and Morrissette's

22    testimony incredible. ECF Nos. 9-12 at 6; 9-16 at 4. That determination is presumed correct and has not been rebutted by a showing of clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Pirtle v. Morgan*, 313 F.3d 1160, 1168 (9th

23    Cir. 2002) (citing *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001)) ("[U]nder AEDPA, factual determinations by the state court are presumed correct and can

24    be rebutted only by clear and convincing evidence."). Even assuming the presumption of correctness is inapplicable for purposes of *Martinez* analysis,

25    there is no basis to disagree with the state district court's determination.

26    [14] Morrissette relies on *McCoy v. Louisiana* in his reply brief. ECF No. 72 at 32–33. As stated, this Court will not entertain new arguments made in a reply brief.

27    *See supra* at p. 13 n.5. Even assuming the Court were to consider reliance on *McCloy*, that decision was made in 2018—after Morrissette's crime, trial, and the finality of his judgment in 2015—and *McCoy* is not retroactively applicable on

28    collateral review. *See Christian v. Thomas*, 982 F.3d 1215, 1225 (9th Cir. 2020).

counsel presented evidence that the sun may have affected visibility by eliciting McMillin's testimony and arguing in summation that the jury should consider Morrissette's line of sight. *Id.* at 36, 40. Thus, the record belies the assertion that counsel did not argue the State failed to meet its obligation to prove that Morrissette neglected a legal duty necessary for the offense.

Fairminded jurists would agree this claim is wholly without merit as Morrissette fails to establish a substantial claim that trial counsel's performance was deficient for the purpose of overcoming the procedural default of this claim. *Martinez*, 566 U.S. at 14–16. Ground 1(D) is dismissed with prejudice.

### E. Ground 1(E)—Failure to Request Instruction on Intervening Cause or Contributory Negligence

Morrissette alleges trial counsel was ineffective in failing to ensure the jury received an intervening cause or contributory negligence instruction, and that counsel's actions demonstrate counsel did not comprehend the elements of the alleged crime. ECF No. 24 at 17–19. Respondents argue the NCA did not directly address this claim, but this Court determined the claim was exhausted. ECF No. 53 at 21–22 (citing ECF Nos. 34-47; 51 at 3–4). They argue the claim is belied by the record and there is no prejudice because the jury received an instruction on contributory negligence, and trial counsel was not deficient because counsel made a strategic decision not to blame the sun or the victim as an intervening cause or present a contributory negligence defense. *Id.* (citing ECF No. 32-27 at 30). Exhausted or not, the trial record demonstrates the trial court instructed the jury on the requirement of proximate cause and the boundaries of a contributory negligence defense. *See supra* at pp. 22–23. Morrissette's claim that trial counsel failed to request those instructions is thus wholly without merit. Accordingly, Morrissette fails to establish a substantial claim that counsel's performance was deficient or prejudicial for the purpose of overcoming the

1    procedural default of this claim. Ground 1(E) is dismissed with prejudice.[15]

2    **F. Ground 1(F)—Advising Morrissette not to Testify.**

3    Morrissette alleges trial counsel was ineffective in advising him not to

4    testify because "only Morrissette could attest to whether he could see Kempe at

5    the time she was struck." ECF No. 24 at 19–20. This Court previously determined

6    this claim is procedurally defaulted and deferred ruling on the default until

7    review on the merits. ECF No. 51 at 7. Respondents argue Ground 1(F) is not

8    substantial and lacks merit because trial counsel reasonably advised Morrissette

9    not to testify. ECF No. 53 at 15.

10    Reno Police Officer Kent Laskin testified he was a first officer on the scene

11    and that Morrissette told him he did not see Kempe and that he thought she was

12    laying on the ground when he drove over her because he felt what he believed

13    was a speed bump. ECF No. 32-35 at 11, 19. Later, and before defense counsel

14    informed the parties at trial that the defense would not argue the sun or Kempe

15    contributed to the incident, defense counsel informed the trial court that

16    Morrissette "already decided" not to testify. ECF No. 32-36 at 53. The trial court

17    canvassed Morrissette concerning his right to testify or not testify and

18    Morrissette acknowledged he understood the right, had no questions about it,

19    and, although his decision was subject to change, he had decided not to testify

20    at that point. *Id.* at 53–55. Defense counsel subsequently stated he was reluctant

21    to call Morrissette to testify that he had a prescription for clonazepam due to,

22    among other things, "issues that he could be cross examined on legitimately if

23    he were to take the stand." ECF No. 32-40 at 34–35. At the conclusion of the

24    State's case, outside the presence of the jury, defense counsel again informed

25    the trial court he advised Morrissette of his right to testify and Morrissette had

26    ────────────────

27    [15] Morrissette argues for the first time in his reply brief that counsel failed to
    *utilize* the contributory negligence and intervening cause instructions to explain
28    how Kempe's actions contributed to her death, ECF No. 72 at 36–37. As discussed
    the Court will not entertain new claims raised for the first time in a reply brief.
    *See supra* at p. 13 n.5.

1  elected not to testify and would instead "stand on the presumption of innocence."

2  *Id.* at 69. Morrissette informed the trial court he gave up his right to testify. *Id.*

3     At the postconviction evidentiary hearing, trial counsel testified he

4  determined it was not a good idea to call Morrissette as a witness at trial because

5  of Morrissette's past criminal issues and because, in counsel's opinion,

6  Morrissette would not present as a good witness due to his manner, demeanor

7  and the ability to cross-examine him. ECF No. 34-27 at 95–96. Morrissette

8  testified he wanted to testify at trial and insisted on it with his trial counsel. *Id.*

9  at 76. Morrissette also agreed he had seven prior felony convictions, but he

10  believed they were not relevant to the jury's determination because they "don't

11  have anything to do with that case in chief, period." *Id.* at 77.

12     Because Morrissette's statement that he did not see Kempe was already

13  presented through the testimony of Officer Laskin, it was not necessary to

14  present his testimony to establish that fact. Counsel's failure to call Morrissette

15  to so testify did not fall below an objective standard of reasonableness.

16  Morrissette fails to establish a substantial claim of trial counsel ineffective

17  assistance, and therefore fails to overcome the procedural default of this claim.

18  *Martinez*, 566 U.S. at 14–16. Ground 1(F) is dismissed with prejudice.

19     **G. IAC Claims as a Whole**

20     Although IAC claims are examined separately to determine whether

21  counsel was deficient, *Strickland* instructs the purpose of the Sixth Amendment's

22  guarantee to counsel is to ensure "[c]riminal defendants receive a fair trial," "a

23  defendant has the assistance necessary to justify reliance on the outcome of the

24  proceeding," and counsel's assistance was "reasonable considering all the

25  circumstances." *See Strickland*, 466 U.S. at 689, 692 (emphasis added). *See also*

26  *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) ("We must analyze each of

27  [petitioner's] claims separately to determine whether counsel was deficient, but

28  'prejudice may result from the cumulative impact of multiple deficiencies.'")

34

(quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978)); *Browning v. Baker*, 875 F.3d 444, 471 (9th Cir. 2017) ("While an individual claiming IAC 'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,' . . . the court considers counsel's conduct *as a whole* to determine whether it was constitutionally adequate.") (internal citation omitted).

Apart from Ground 1(A), Morrissette did not establish that, as a whole, he received constitutionally inadequate assistance from counsel denying him due process or a fair trial.

## H. Ground 2—Cumulative Effective of IAC

Morrisette alleges the cumulative effect of trial counsel's errors violates his rights under the Sixth and Fourteenth Amendments. ECF No. 24 at 20–21. This Court previously determined this claim is procedurally defaulted as to some of the grounds raised and deferred ruling on the default until its review on the merits. ECF No. 51 at 7. Respondents argue Morrissette fails to demonstrate any error, let alone cumulative error. ECF No. 53 at 22–24.

The NCA denied this claim with respect to the claimed errors presented to that court, i.e. Grounds 1(A) and 1(B):

> [M]orrissette appeared to argue he was entitled to relief due to the cumulative effect of counsel's errors. However, Morrissette failed to demonstrate any errors and, accordingly, he was not entitled to relief. Therefore, the district court did not err by denying this claim.

ECF No. 9-16 at 4.

For Grounds 1(A) and 1(B), the NCA's determination is reasonable as there are no errors to cumulate. Because Morrissette's cumulative error claim is without factual support in Grounds 1(C)–1(F), he fails to establish a substantial claim to overcome the procedural default of the cumulative error claim as to those claims. *Martinez*, 566 U.S. at 14–16. The cumulative error claim for Ground 2, as to Grounds 1(A)–1(B) is denied. The cumulative error claim for

35

1  Ground 2 as to Grounds 1(C)–1(F) is dismissed with prejudice.

2  **V.    CERTIFICATE OF APPEALABILITY**

3  Under Rule 11 of the Rules Governing Section 2254 Cases, the Court has

4  *sua sponte* evaluated the claims within the Petition for suitability for the

5  issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851,

6  864–65 (9th Cir. 2002). "To obtain a COA under § 2253(c), a habeas prisoner

7  must make a substantial showing of the denial of a constitutional right," and for

8  claims rejected on the merits, a petitioner "must demonstrate that reasonable

9  jurists would find the district court's assessment of the constitutional claims

10 debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (citing

11 *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a

12 COA will issue if reasonable jurists could debate whether (1) the petition states

13 a valid claim of the denial of a constitutional right; and (2) this Court's procedural

14 ruling was correct. *See id.* Applying these standards, a COA is not warranted.

15 **VI.    CONCLUSION**[16]

16 It is therefore ordered that the Petition for Writ of Habeas Corpus under

17 28 U.S.C. § 2254 (ECF No. 24) is conditionally granted as to Ground 1(A) and

18 denied as to the remaining grounds of the Petition. Petitioner Jerry Lee

19 Morrissette's Judgment of Conviction filed on March 11, 2015, in case number

20 CR14-0671 in the Second Judicial District Court for the State of Nevada in and

21 for the County of Washoe is vacated. Petitioner Jerry Lee Morrissette will be

22 released from custody, restraint, and/or continuing consequences from the

23 conviction within 90 days of the later of (1) the conclusion of any proceedings

24 seeking appellate or certiorari review of this court's judgment, if affirmed, or (2)

25 the expiration for seeking such appeal or review, unless the State through the

26

27 [16] The Court notes that the parties made several arguments and cited to several
cases not discussed above. The Court has reviewed these arguments and cases

28 and determines that they do not warrant discussion as they do not affect the
outcome of the issues before the Court.

1    respondents files within the 90 day period a written election in this matter to

2    commence trial proceedings against Morrissette regarding the November 24,

3    2014, Second Amended Information accusing Morrissette of Causing the Death

4    of Another by Driving or Being in Actual Physical Control of a Vehicle While

5    Under the Influence of a Controlled and/or Prohibited Substance, a violation of

6    NRS § 484C.430, and thereafter commences jury selection within 120 days

7    following the election to retry Morrissette.

8           It is further ordered that a Certificate of Appealability is denied.

9           It is further ordered that the Clerk of the Court (1) substitute John Henley

10   as respondent for Respondent Perry Russell, (2) enter judgment accordingly, (3)

11   provide a copy of this order and the judgment to the Clerk of the Second Judicial

12   District Court for the State of Nevada in and for the County of Washoe in

13   connection with that court's case number CR14-0671, and (4) close this case.

14          DATED THIS 29th day of September, 2025.

15

16   _____

17   ANNE R. TRAUM
     UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

27

28